**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

JACKIE SAEEMODARAE,

        Plaintiff,

vs.

MERCY HEALTH SERVICES—IOWA
CORP., d/b/a MERCY MEDICAL
CENTER,

        Defendant.

No. C 05-4136-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

———————————————

**TABLE OF CONTENTS**

*I.*  *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *A.*  *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *B.*  *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        *1.*    *Facts admitted by operation of local rules* . . . . . . . . . . . . . 6
        *2.*    *Undisputed facts* . . . . . . . . . . . . . . . . . . . . . . . . . 8
        *3.*    *Further undisputed and disputed facts* . . . . . . . . . . . . . . 12
    *C.*  *Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . . 14
        *1.*    *Mercy's argument* . . . . . . . . . . . . . . . . . . . . . . . . . 14
        *2.*    *Saeemodarae's response* . . . . . . . . . . . . . . . . . . . . . . 15
        *3.*    *Mercy's reply* . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*II.*  *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    *A.*  *Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . 19
    *B.*  *Title VII's "Religious Organization" Exemption* . . . . . . . . . . . . . 21
        *1.*    *The applicable exemption* . . . . . . . . . . . . . . . . . . . . . 21
        *2.*    *Can Mercy assert the exemption?* . . . . . . . . . . . . . . . . . 24
        *3.*    *Does the exemption apply to Saeemodarae's claims?* . . . . . . 30
            *a.*    *The religious discrimination claim* . . . . . . . . . . . . . 30
            *b.*    *The retaliation claim* . . . . . . . . . . . . . . . . . . . . 32

    *C. The ICRA's "Bona Fide Religious Institution" Exemption* . . . . . . . . . 34
        *1.    The applicable exemption* . . . . . . . . . . . . . . . . . . . . . 34
        *2.    Should the court exercise supplemental jurisdiction to interpret the exemption?* . . . . . . . . . . . . . . . . . . . . . . . 35

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

The plaintiff in this action, a practicing Wiccan,[1] asserts religious discrimination and retaliation claims under federal and state law arising from the termination of her employment with a medical center that claims to have a Roman Catholic identity. The defendant moved to dismiss on the ground that it is a bona fide religious institution exempt from religious discrimination and retaliation claims pursuant to 42 U.S.C. § 2000e-1(a) and IOWA CODE § 216.6(6)(b). The court converted the defendant's motion to dismiss to a motion for summary judgment and gave the parties a limited time to conduct discovery pertaining to the narrow questions of whether or not the defendant is entitled to the "religious organization" exemptions under state and federal law. After such discovery, the defendant refiled its motion to dismiss as a motion for

---

[1] Federal courts have recognized Wicca (also known under various names, including "the Wiccan (or Wiccian) religion," "the Craft," "witchcraft," or "the Old Religion") as a bona fide, established, or sincerely held religion that is protected, for example, by the Free Exercise clause of the First Amendment to the United States Constitution or Title VII of the Civil Rights Act of 1964. *See, e.g., Dettmer v. Landon*, 799 F.2d 929, 931-32 (4th Cir. 1986) (Wicca is a religion protected by the Free Exercise clause of the First Amendment to the United States Constitution); *Van Koten v. Family Health Mgmt., Inc.*, 955 F. Supp. 898, 902 (N.D. Ill. 1997) (finding that Wicca was a "religion" within the meaning of Title VII), *aff'd*, 134 F.3d 375 (7th Cir. 1998) (table op.) (finding sufficient evidence to assume a *prima facie* case, including that the plaintiff was asserting protection on the basis of a "religion" within the meaning of Title VII).

summary judgment. The court must now consider whether the plaintiff has generated genuine issues of material fact on the defendant's qualification for the "religious organization" exemptions from discrimination and retaliation claims under federal and state law.

## I. INTRODUCTION

### A. Procedural Background

In a Complaint filed November 18, 2005 (docket no. 2), plaintiff Jackie Saeemodarae alleges that she was terminated from her employment as a medical telemetry technologist with Mercy Health Services—Iowa Corp., doing business as Mercy Medical Center (Mercy), because she is a practicing Wiccan. She alleges claims of religious discrimination and retaliation for claiming religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Iowa Civil Rights Act (ICRA), IOWA CODE CH. 216.

On February 21, 2006, Mercy filed a pre-answer Motion To Dismiss (docket no. 6) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting that Saeemodarae fails to state claims upon which relief can be granted, because Mercy is a bona fide religious institution exempt from religious discrimination claims pursuant to 42 U.S.C. § 2000e-1(a) and IOWA CODE § 216.6(6)(b). Mercy attached to its motion to dismiss the affidavit of a corporate officer and various corporate documents that Mercy contended demonstrate that it falls within the "religious organization" exemptions of Title VII and the ICRA. Mercy argued that most of these documents are public records, but "d[id] not object to the court treating its motion as a motion for summary judgment pursuant to Rule 56," or to the court "allowing Plaintiff's counsel to conduct discovery regarding whether Defendant constitutes a religious institution within the meaning of the Title VII and [ICRA] religious institution exemptions." Defendant's Brief In Support Of

Motion To Dismiss (docket no. 6-4), 3 n.2. In her March 15, 2006, response to Mercy's motion to dismiss (docket no. 9), Saeemodarae contended that Mercy had admitted that its exempt status was not ripe for determination before any discovery was conducted. Consequently, Saeemodarae argued that, at a minimum, she was entitled to conduct discovery prior to a determination on the exemption issue.

By order dated March 17, 2006 (docket no. 11), the court, in an abundance of caution, converted Mercy's Rule 12(b)(6) motion into a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The court also established a schedule for discovery on issues pertaining to the applicability of the "religious organization" exemptions and a schedule for the refiling and briefing of Mercy's motion as a motion for summary judgment. More specifically, the court's March 17, 2006, order gave the parties to and including June 14, 2006, to conduct discovery pertaining to the narrow questions of whether or not defendant Mercy is entitled to the exemptions from religious discrimination claims against religious organizations found in 42 U.S.C. § 2000e-1(a) and IOWA CODE § 216.6(6) and, if so, whether such exemptions apply to all of Saeemodarae's claims. The order also directed that, on or after June 28, 2006, but not later than July 12, 2006, defendant Mercy was required to refile its motion to dismiss as a motion for summary judgment "in full compliance with Rule 56 and N.D. IA. L.R. 56.1," and that Saeemodarae was required thereafter to file a response to the motion for summary judgment "in full compliance with Rule 56 and N.D. IA. L.R. 56.1." Finally, the order provided that, upon the request of either party, the court would consider whether or not to set oral arguments on the converted motion for summary judgment.

On July 12, 2006, Mercy filed its Motion For Summary Judgment (docket no. 12), which reasserted the exemption issue. Mercy's motion included an extensive Statement Of Undisputed Facts (docket no. 12-2). On July 14, 2006, Mercy also filed an Answer with affirmative defenses (docket no. 13), asserting, *inter alia*, Mercy's "religious

organization" exemptions. On July 21, 2006, Saeemodarae filed her Resistance To Defendant's Motion For Summary Judgment (docket no. 15), which included a Statement Of Disputed Facts (docket no. 15-3), but no separate response to Mercy's Statement Of Undisputed Facts. On July 31, 2006, Mercy filed a Reply (docket no. 16), in further support of its motion for summary judgment, which, among other things, pointed out Saeemodarae's failure to respond to Mercy's Statement Of Undisputed Facts. On the basis of Saeemodarae's failure to respond, Mercy argues that its factual statements must be deemed admitted pursuant to applicable local rules. Saeemodarae has never responded to that contention. In addition, on July 31, 2006, Mercy filed a separate request for oral arguments on its motion for summary judgment (docket no. 17).

By order dated July 31, 2006 (docket no. 18), the court set oral arguments on Mercy's motion for summary judgment for September 29, 2006.[2] At the oral arguments, plaintiff Jackie Saeemodarae was represented by Shelley A. Horak of Horak & Associates in Sioux City, Iowa. Defendant Mercy Health Services was represented by Thomas W. Foley of Nyemaster, Goode, West, Hansell & O'Brien, P.C., in Des Moines, Iowa. The court finds that Mercy's motion for summary judgment is now ripe for disposition.

### B.  Factual Background

Ordinarily, in a ruling on a motion for summary judgment, this court would not attempt a detailed dissertation of the undisputed and disputed facts in the case. Rather, the court would provide sufficient facts, both undisputed and disputed, to put in context the parties' arguments for and against summary judgment. In this case, however, the question of whether the Title VII "religious organization" exemption applies requires the court to "look at all the facts to decide if the [defendant] is a religious corporation or educational

---

[2]The court regrets that the oral arguments could not be set sooner, owing to the court's crowded schedule.

institution," and in making this inquiry, "[i]t is appropriate to consider and weigh the religious and secular characteristics of the institution." *Hall v. Baptist Memorial Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000). It is likely that the same inquiry applies to the question of whether or not the "religious organization" exemption under the ICRA applies. Thus, a more complete statement of the pertinent facts is appropriate in this case. Moreover, the court finds that many of the pertinent facts must be deemed admitted by operation of local rules.

### 1. Facts admitted by operation of local rules

As to the latter point, the court notes that, in its March 17, 2006, order (docket no. 11) converting Mercy's original motion to dismiss into a motion for summary judgment, the court expressly directed the parties that their filings in support of or resistance to the converted motion for summary judgment must be "in full compliance with Rule 56 and N.D. IA. L.R. 56.1." Mercy filed with its summary judgment motion a Statement Of Undisputed Facts (docket no. 12-2) as required by N.D. IA. L.R. 56.1(a)(3), but Saeemodarae did not include with her response to the summary judgment motion a response to Mercy's statement of facts as required by N.D. IA. L.R. 56.1(b)(2).

Local rule 56.1(b) provides, in pertinent part, as follows:

> **b.** **Resisting Party's Documents**. A party resisting a motion for summary judgment must, within 21 days after service of the motion, file contemporaneously all of the following:
> * * *
> **2.** A response to the [moving party's] statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact, filed as an electronic attachment to the brief under the same docket entry[.]

N.D. IA. L.R. 56.1(b)(2). The rule provides, further, as follows:

> A response to an individual statement of material fact
> that is not expressly admitted must be supported by references
> to those specific pages, paragraphs, or parts of the pleadings,
> depositions, answers to interrogatories, admissions, exhibits,
> and affidavits that support the resisting party's refusal to admit
> the statement, with citations to the appendix containing that
> part of the record. *The failure to respond, with appropriate
> citations to the appendix, to an individual statement of material
> fact constitutes an admission of that fact.*

N.D. IA. L.R. 56.1(b) (unnumbered paragraph) (emphasis added).

In this case, the court had required the parties to adhere to the requirements of this local rule when filing and responding to the motion for summary judgment, but Saeemodarae failed to provide a response to Mercy's Statement Of Undisputed Facts (docket no. 12-2) as required by N.D. IA. L.R. 56.1(b)(2). Even after Mercy called that omission to Saeemodarae's attention in its Reply, Saeemodarae did not amend her response to Mercy's motion for summary judgment to include a response to Mercy's Statement Of Undisputed Facts, probably because she had no objective basis upon which to challenge Mercy's Statement Of Undisputed Facts. Under these circumstances, the court finds that Mercy's Statement Of Undisputed Facts, in its entirety, must be deemed admitted. *See* N.D. IA. L.R. 56.1(b) (statements of fact to which no response is made are admitted).

Moreover, pursuant to the local rule, Saeemodarae's Statement Of Disputed Facts (docket no. 15-3) is supposed to be "[a] statement of *additional* material facts that the resisting party contends preclude summary judgment," N.D. IA. L.R. 56.1(b)(3) (emphasis added), not a response to the moving party's statement of facts. Thus, even if Saeemodarae's Statement Of Disputed Facts purports to contradict or dispute facts asserted in Mercy's Statement Of Undisputed Facts, the attempt to contradict or dispute those facts will be disregarded.

### 2. *Undisputed facts*

The facts admitted by operation of local rules, and hence, undisputed for purposes of Mercy's motion for summary judgment are the following:[3]

Mercy Medical Center—Sioux City (the Hospital), where plaintiff Jackie Saeemodarae was employed, is owned and operated by defendant Mercy Heath Services—Iowa Corp. (Mercy). The Hospital is one of many hospitals founded by the Sisters of Mercy, a Roman Catholic religious order, founded in Ireland, and dedicated to serving the poor. As the Sisters of Mercy spread throughout Europe and settled in the United States, the Order established educational institutions, hospitals and social service ministries. Among the institutions founded by the Sisters of Mercy was the first Mercy Hospital, which was founded in the United States on approximately January 1, 1847, in Pittsburgh, Pennsylvania. Since that time, the Sisters of Mercy have come to sponsor or co-sponsor approximately 140 health-related facilities throughout the United States, including hospitals, long term care facilities, rehabilitation centers, and family care and outreach centers. There are presently six Mercy-sponsored and co-sponsored health systems in the United States, including Trinity Health Corporation, as well as a number of independent hospitals. Trinity Health Corporation is the fourth largest Catholic Healthcare System in the United States.

The Sisters of Mercy first established a hospital in Sioux City, Iowa in 1890, at the request of civic leaders who sought to establish a new hospital that was not associated with city government. The hospital was established when Mother Mary Agatha Murphy purchased a house and converted it into a hospital. That hospital was named St. Joseph Mercy Hospital. The Sisters of Mercy purchased St. Vincent's Hospital in Sioux City,

---

[3]This reiteration of facts from Mercy's Statement Of Undisputed Facts has been edited and reorganized as the court has deemed appropriate. The substance of the factual statements, however, has not been altered.

Iowa, from the Benedictine Sisters in 1977, and merged the two hospitals under the name Marian Health Center. In 1999, Marian Health Center's name was formally changed to Mercy Medical Center—Sioux City.

Mercy Medical Center—Sioux City (the Hospital) is one of the hospitals owned and operated by defendant Mercy Health Services—Iowa Corp., doing business as Mercy Medical Center (Mercy). Mercy is, in turn, a Delaware, non-stock corporation. Mercy is a non-profit corporation under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. §501(c)(3). Mercy owns and operates hospitals and other health services entities in the state of Iowa, including Mercy Medical Center—Sioux City (the Hospital). Mercy is a wholly controlled subsidiary of Trinity Health—Michigan, and Trinity Health—Michigan is the sole corporate member of Mercy. Trinity Health—Michigan is a Michigan non-profit corporation that seeks to act in ways that promote the spiritual teachings and principles of the Roman Catholic Church. Trinity Health—Michigan is, in its turn, a wholly controlled subsidiary of Trinity Health Corporation, an Indiana non-profit corporation.

Trinity Health Corporation and Mercy are sponsored by Catholic Health Ministries. Catholic Health Ministries is a public juridic person of the Roman Catholic Church, and its activities are carried out in a manner consistent with the guidelines and directives of Catholic Health Ministries and the Roman Catholic Church. The Roman Catholic Church recognizes Catholic Health Ministries as an entity that acts in the name of the Church with respect to Church sponsored work.

In the event of dissolution, all of Mercy's assets must be distributed to Trinity Health—Michigan, provided that upon dissolution Trinity Health—Michigan is an existing, benevolent, charitable, scientific, religious, or educational institution, and is qualified as a tax exempt organization under Internal Revenue Code section 501(c)(3). If Trinity Health—Michigan, is not so qualified, the assets of Mercy must be distributed to an

organization that Trinity Health—Michigan designates, provided that organization meets all of the criteria set forth above.

Mercy's mission is to continue the healing ministry of the Catholic Church and to promote the well being of the people it serves by living the values of compassion, respect, concern for the poor, excellence, and stewardship. Mercy fulfills its mission, and thus advances the healing ministries of the Catholic Church, by engaging in activities that permit Mercy to prevent disease and promote public health; care for the sick, injured and disabled; conduct medically related research; and otherwise further charitable, scientific, and educational endeavors and support and provide services and programs for the health, well being, and benefit of all people. To further its mission, Mercy owns, operates, and manages hospitals, health care and related supporting or ancillary facilities, office buildings, clinics, outpatient facilities, intermediate care facilities, nursing homes, and other facilities that promote or support the aforementioned health services activities. Under its Bylaws, Mercy must conduct its activities in a manner consistent with The Guiding Principles for Catholic Health Ministries and its Apostolic Works, the teachings of the Roman Catholic Church, and other directives promulgated by Catholic Health Ministries. It must also act in a manner that promotes the values and principles inherent in the medical-moral teachings of the Church, including the Ethical and Religious Directives for Catholic Health Care Services, as approved by the National Conference of Catholic Bishops.[4]

During orientation, new employees of the Hospital are informed of Mercy's Catholic history, its Catholic identity, and its Catholic mission. The Hospital's employee policy manual informs employees of the Hospital's Catholic background and of its Catholic mission. A chaplain from the medical center's Pastoral Care Department leads morning

---

[4] A copy of the Ethical and Religious Directives for Catholic Health Care Services is included in Mercy's Appendix at pages 48-63.

and afternoon prayers and devotions on a daily basis. The prayers and devotions are broadcast over the Hospital's loudspeakers. All employees are invited to participate. The Hospital has a chapel on its premises. A Catholic mass, including scripture readings from the Bible, is held in the chapel at noon on a daily basis. The Hospital also holds services at its chapel on Catholic Holy Days of Obligation, including traditional Stations of the Cross during Lent. Bibles are made available to patients and family members, both in the chapel and in the patient rooms. During Advent, the Hospital displays two nativity scenes depicting Christ's birth. One of the nativity scenes is live. The Hospital displays other religious symbols throughout its facilities. All patient rooms have a cross on the wall. Crosses are displayed throughout the Hospital's facilities. There is a statue of Jesus Christ at the main entrance to the Hospital. At the patient entrance to the Hospital, a religious painting is displayed. Artworks depicting Christ or other religious scenes are also displayed throughout the Hospital.

Beginning in 2002, the Hospital began an initiative that resulted in promoting the "Renewed Culture" of Mercy. Mercy chose "F.I.S.H." as a symbol of its Renewed Culture. The symbol associated with F.I.S.H. was used by early Christians to share their faith while avoiding persecution. As an acronym, F.I.S.H. stands for "Faith-Inspired Service and Healing." Mercy's Faith-Inspired Service and Healing initiative is explained to all new employees during orientation. New employees are taught that each of these four characteristics, Faith, Inspired, Service and Healing, is essential to Mercy fulfilling its mission. During orientation, new employees are provided a bookmark and lapel pin both of which display the F.I.S.H. symbol. The F.I.S.H. symbol is displayed throughout the Hospital, on letterhead, on the website, on the intranet, on computer screen savers, and on murals and walls. The Hospital annually honors an employee who illustrates exceptional performance that represents and demonstrates the employee's commitment to the Hospital's values and the Hospital's culture of Faith Inspired Service and Healing. The

award is named after Sister Catherine McAuley, and nominees are evaluated in areas including compassion, stewardship, respect, concern for those who are poor, excellence, faith, inspiration, service, and healing.  In May of 2006, Sister Marlys Becker, a Chaplain at Mercy, was honored as the most recent recipient of the award.

The Pastoral Care Department includes four full-time chaplains, one part-time chaplain, and three on-call chaplains.  Volunteers also provide Chaplain services, including Deacon candidates from the Sioux City and Sioux Falls Catholic Dioceses.  Consistent with Trinity Health guidelines, Mercy has a Director of Mission Services and Ethics who provides leadership for Mercy's mission services and who promotes the mission and philosophy of Trinity Health and Mercy Health Network.  The person who holds this position is required to be Roman Catholic.  The Director of Mission Services and Ethics also serves as the Director of the Pastoral Care Department.

### 3.     *Further undisputed and disputed facts*

Although Saeemodarae did not respond to any of the facts stated above, she did file her own Statement Of Disputed Facts (docket no. 15-3).  In its Response To Plaintiff's Statement Of Disputed Facts, Mercy admits, qualifies, and denies various of Saeemodarae's additional factual statements.  As only these additional facts can potentially generate genuine issues of material fact, the court will also examine these additional facts in some detail.

The parties agree that Mercy has 2,100 employees in the Siouxland area.  Mercy recruits its employees from many sources, but while Saeemodarae contends that none of those sources are church or religion based, Mercy contends that some of the referral sources may be church or religion based.  The parties do agree, however, that Mercy has

an Equal Employment Opportunity/Workforce Diversity Policy, although they dispute the precise language of that policy.[5]  Mercy submits that the language is as follows:

> It is the policy of Mercy to provide equal employment opportunities in all aspects of employer/staff member relations and not discriminate for any reason prohibited by law.  Mercy is further committed to going beyond the legal requirements of equal employment opportunity to take action to achieve diversity in our working environment.

Mercy does not require its employees to disclose their religious affiliations, with one exception:  Pursuant to a mandate in the Ethical and Religious Directives for Catholic Health Care Services, the Director of Mission and Ethics is required to disclose his or her religious affiliation, because the position requires the employee serving in that capacity to have a Roman Catholic religious affirmation.  Mercy also admits that it does not require *all* of its employees to attend specific religious instruction, seminars, or workshops, but argues that certain employees are required to attend religious instructions, seminars, and workshops in the course of performing their jobs.  Only the person in the Pastoral Care Chaplain position at Mercy is required to conduct religious activities as an essential function of the job.  According to Saeemodarae, ten of the fifteen members of Mercy's Board of Directors are Catholic, while Mercy admits that two-thirds of the board members are "of the Roman Catholic religious affiliation."

Saeemodarae contends, and Mercy does not dispute, that Saeemodarae filed a complaint with the Iowa Civil Rights Commission (ICRC) alleging religious discrimination by Mercy, and several months later, filed a second complaint with the ICRC alleging retaliation.  Although Saeemodarae contends that the ICRC cross-filed both of Saeemodarae's administrative complaints with the federal Equal Employment Opportunity

---

[5]The dispute over the precise language of the policy seems to concern matters of accuracy, rather than the import of that language.

Commission (EEOC), Mercy contends that the pages of her appendix to which Saeemodarae cites in support of this contention do not actually support that contention. Mercy also does not dispute that the ICRC conducted an investigation of Saeemodarae's administrative complaints and issued "probable cause" findings that there was probable cause to believe that religious discrimination and retaliation had taken place. However, Mercy points out that it did not raise the "religious organization" exemptions in the administrative proceedings.

## C.  Arguments Of The Parties

### 1.  Mercy's argument

Mercy contends that the undisputed facts demonstrate that, as a matter of law, it is entitled to invoke the "religious organization" exemptions under Title VII and the ICRA to Saeemodarae's religious discrimination and retaliation claims.  Mercy argues that the language of the ICRA exemption is almost identical to the language of the federal exemption and that, while no Iowa court has yet interpreted the scope of the exemption under the ICRA, Iowa courts have made clear that they will interpret other provisions of the ICRA by looking to federal law, so that the scope of the two exemptions should be deemed to be identical.

Mercy argues that the exemption is not limited to religious discrimination in hiring, but applies to all aspects of employment.  Under the weighing test used to determine the applicability of the exemption, Mercy contends that a weighing of its significant religious and secular characteristics demonstrates that it is entitled to invoke the exemption.  First, Mercy argues that its purpose and character are primarily religious, because its mission is to continue the healing ministry of the Catholic Church and to promote the values of the Catholic Church.  More specifically, Mercy argues that it is undisputed that new employees are taught during orientation about the Hospital's Catholic identity and mission.

Indeed, Mercy contends that its articles of incorporation and bylaws confirm the Hospital's overriding religious character and purpose by requiring, among other things, that the Hospital conduct its activities in a manner consistent with The Guiding Principles For Catholic Ministries In Its Apostolic Works and consistent with the teachings of the Roman Catholic Church. Mercy also argues that its day-to-day operations, including the broadcast of daily prayers and devotions over the Hospital's loudspeakers, activities of its Chaplains, its Faith-Inspired Service and Healing (F.I.S.H.) initiative, and the prevalence of Christian and Catholic symbols and decorations throughout the Hospital, all demonstrate its character as a religious organization.

Mercy also argues that it is clear that the "religious organization" exemptions apply to Saeemodarae's religious discrimination claims, and that the exemptions should also apply to Saeemodarae's retaliation claims, because those claims are based on retaliation for asserting the underlying religious discrimination claims. Mercy contends that, logically, where an exemption applies to the religious discrimination claims, it makes little sense to permit retaliation claims, because to do so would erode the intended effect of the exemptions. In the alternative, Mercy argues that, even if the exemptions do not apply to Saeemodarae's retaliation claims, those claims fail as a matter of law, because Saeemodarae did not engage in any conduct protected by Title VII or the ICRA, where neither Title VII nor the ICRA prohibits religious discrimination by a religious organization, and Saeemodarae could not have reasonably believed that her religious discrimination claim was protected by the statutes. Mercy also points out that Saeemodarae never alleged religious discrimination or retaliation "under Title VII."

### 2.    *Saeemodarae's response*

In her response, Saeemodarae contends that Mercy simply is not a "religious organization" entitled to assert the exemptions on which Mercy relies. She points out that, unlike other institutions that courts have held properly invoked the Title VII exemption,

members of Mercy's governing board are not required to be Catholic and, in fact, only ten of the fifteen members of the board are Catholic, that Mercy recruits its employees from the population at large, using many sources, none of which could be characterized as "Catholic," and that Mercy does not *require* its employees to take religious instruction or require a particular religious affiliation for any employee other than the Director of Mission and Ethics, who is also the Director of the Pastoral Care Department. Thus, she asserts that Mercy is a "religious organization" in name only, but not in operation.

Next, Saeemodarae argues that her retaliation claim is not barred by the "religious organization" exemption under Title VII, even if her religious discrimination claim is barred. She contends that her retaliation claim is a "participation" claim, because she alleges that she was retaliated against for filing a charge of religious discrimination with the ICRC and EEOC. She contends that she reasonably believed that Mercy's conduct constituted religious discrimination, and a reasonable Civil Rights Commission did find "probable cause" to believe that unlawful retaliation had occurred. Saeemodarae contends that Mercy's failure to raise the "religious organization" exemptions in the administrative proceedings further demonstrates the reasonableness of her belief that she was asserting valid religious discrimination claims. She also contends that there is no doubt that, by asserting "religious discrimination" and "retaliation" in her administrative complaints, she was asserting those claims "under" both state and federal law.

Finally, Saeemodarae argues that her state-law claims should survive summary judgment, because the language of the ICRA "religious organization" exemption is not identical to the language of the Title VII exemption. Consequently, she asserts that the court cannot simply "graft" the federal exemption onto the Iowa exemption. Specifically, she points out that a fair reading of the Iowa exemption is that it applies only if the required religious qualification of employees has a bona fide religious purpose, which applies to employees such as instructional or supervisory personnel. In contrast, she

contends that her job as a telemetry technician cannot reasonably be held to require any religious qualification.

### 3. *Mercy's reply*

In reply, Mercy argues that the "religious organization" exemption under Title VII applies to *all* activities of the religious organization, including those that are purely secular in nature. Notwithstanding Saeemodarae's attempts to generate genuine issues of material fact on the question, Mercy argues that it is clear that Mercy's pervasive and predominant character and purpose are religious. The facts that Saeemodarae relies on to try to demonstrate the contrary, Mercy asserts, are "isolated" and "insignificant" in light of the rest of the evidence. Mercy also points out that courts have held that a religious organization does not lose its sectarian character merely because it employs persons of other faiths or religious beliefs. While Mercy admits that it does not require employees to undergo religious instruction, it is undisputed that Mercy includes significant instruction regarding its religious origins, values, and beliefs in its employee orientation process and employee handbook. Thus, Mercy contends that its religious moorings and purpose are no mystery to its employees.

Mercy also argues that the secular nature of Saeemodarae's telemetry technician position cannot undermine the overriding religious character and purpose of the Hospital. Similarly, Mercy contends that Saeemodarae's argument that the "religious organization" exemptions only apply to positions that involve religious activities is simply wrong, where the Title VII exemption was expanded in 1972 to make clear that it includes *all* activities of religious organizations, not just those that are purely religious in nature. While Mercy acknowledges that it has an "Equal Employment Opportunity/Workforce Diversity" policy, Mercy points out that the policy only states that Mercy will not discrimination "for any reason prohibited by law," and religious discrimination by a religious organization is not "prohibited by law."

Mercy rejects Saeemodarae's contention that the ICRA exemption is sufficiently different from the Title VII exemption that it does not exempt the claims that Saeemodarae has asserted against Mercy. While Mercy acknowledges that the state and federal exemptions do not use identical language, Mercy nevertheless argues that the language of the state exemption neither plainly nor materially differs from the language of the federal exemption. Mercy argues that Saeemodarae's interpretation of the state exemption to apply only to employees for whom there is a bona fide religious qualification is not persuasive. Indeed, Mercy argues that the Iowa exemption expressly permits it to do what Saeemodarae contends Mercy has done as the basis for her religious discrimination claim.

Mercy also argues that Saeemodarae's retaliation claims must be dismissed, either because they are barred by the "religious organization" exemptions, or because they are otherwise fatally flawed. Mercy contends that Saeemodarae did not attempt to rebut Mercy's argument that the retaliation claims are barred by the exemptions because they are derived from the religious discrimination claims, which are plainly barred. With respect to Mercy's second argument, insufficiency of the retaliation claims, Mercy contends that nothing but Saeemodarae's filing of her administrative complaints and the Commission's "probable cause" finding supports a reasonable belief that Saeemodarae had been subjected to unlawful religious discrimination. Mercy contends that Saeemodarae has failed to address the fundamental issue, which is that Title VII and the ICRA do not prohibit the conduct upon which Saeemodarae's religious discrimination claims were based. Thus, Mercy asserts, Saeemodarae's subjective belief that her administrative complaint asserted religious discrimination is of no moment. Furthermore, Mercy argues that administrative "probable cause" findings are not probative in summary judgment proceedings in court and that its failure to assert the exemptions in the administrative proceedings is irrelevant, because the "religious organization" exemption cannot be waived by either party under applicable law.

Finally, Mercy contends that it never asserted that Saeemodarae had failed to use the magic words "discrimination under Title VII"; rather, its argument that Saeemodarae had never alleged discrimination "under Title VII" was an argument that Saeemodarae never alleged any conduct that is prohibited by Title VII (or the ICRA).

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a prosecuting or defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims at issue. FED. R. CIV. P. 56(a) (summary judgment for claimant) & (b) (summary judgment for defending party). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377 (same). The court is prohibited from making credibility judgments or engaging in fact-finding from conflicting evidence on a motion for summary judgment. *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1075 (8th Cir. 2006); *Yates v. Rexton, Inc.*, 267 F.3d 793, 800 (8th Cir. 2001).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

The court will apply these standards to Mercy's motion for summary judgment.

### B.  Title VII's "Religious Organization" Exemption

Mercy contends that it is entitled to summary judgment on Saeemodarae's Title VII religious discrimination and retaliation claims, because it is a "religious organization" exempt from such claims pursuant to 42 U.S.C. § 2000e-1(a).  Saeemodarae disputes that contention.

### 1.  The applicable exemption

"Section 702 of the Civil Rights Act of 1964, 78 Stat. 255, as amended, 42 U.S.C. § 2000e-1, exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion."  *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 329 (1987). Specifically, this "religious organization" exemption provides as follows:

> This subchapter [i.e., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.] shall not apply ⋯ to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a).[6]  As the Sixth Circuit Court of Appeals has explained, this exemption was made "[i]n recognition of the constitutionally-protected interest of religious

---

[6]In *Amos*, the Supreme Court concluded that this provision passed constitutional muster, over objections that it violated the Establishment Clause and the Equal Protection Clause of the United States Constitution.  *Amos*, 483 U.S. at 336-40; *see also Scharon v. St. Luke's Episcopal Presbyterian Hospitals*, 929 F.2d 360 (8th Cir. 1991) (holding that applying Title VII to sex discrimination claims by the chaplain of a hospital with a religious affiliation would require "excessive entanglement with religion").

organizations in making religiously-motivated employment decisions." *Hall v. Baptist Mem. Health Care Corp.*, 215 F.3d 618, 623 (6th Cir. 2000).[7]

Some form of exemption for religious organizations has been a part of Title VII from its inception, but the scope of the exemption has been modified and amended:

> The legislative history of Title VII shows that Congress intended to exclude religious employers from the provisions prohibiting religious discrimination. The original version of the 1964 Civil Rights Act, H.R. 7152, excluded religious employers from all of Title VII. H.R. REP. NO. 88-914 (1963) reprinted in EEOC Legislative History of Title VII and XI of Civil Rights Act of 1964 at 2010 (1968) ("1964 Legis. Hist."); 1964 U.S.C.C.A.N. 2355. This exemption was redrafted to apply the bulk of Title VII's provisions to religious employers but still permitted them to employ individuals of a particular religion. 1964 Legis. Hist. at 3001, 3004, 3050. This version passed both the House and Senate. *EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1276-77 (9th Cir. 1982).

---

[7]Title VII also includes other exemptions from religious discrimination claims. *See* 42 U.S.C. § 2000e-2(e)(2) (permitting religious educational institutions "to hire and employ employees of a particular religion if such school ⋯ is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution is directed toward the propagation of a particular religion.") ("religious school" exemption); 42 U.S.C. § 2000e-3(b) ("[A] notice or advertisement may indicate a preference, limitation, specification, or discrimination based on religion, sex, or national origin when religion, sex, or national origin is a bona fide occupational qualification for employment.") ("bona fide religious qualification" exemption). The "ministerial exception" to Title VII "'precludes civil courts from adjudicating employment discrimination suits by ministers against the church or religious institution employing them.'" *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940, 945 (9th Cir. 1999) (quoting *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 461 (D.C. Cir. 1996)). However, "[t]he source of the ministerial exception is the Constitution rather than the statute." *Id.* No party has asserted that any exemption or exception other than the "religious organization" exemption in § 2000e-1(a) is applicable here.

*Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 140 (3d Cir. 2006). Although the redraft of the exemption narrowed its scope to exempt "religious organizations" only from "religious" discrimination claims, an amendment in 1972 expanded the exemption in another respect:

> Prior to [1972], § 702 exempted only the religious activities of religious employers from the statutory proscription against religious discrimination in employment. The 1972 amendment extending the exemption to all activities of religious organizations was sponsored by Senators Allen and Ervin. Senator Ervin explained that the purpose of the amendment was to "take the political hands of Caesar off of the institutions of God, where they have no place to be." 118 Cong.Rec. 4503 (1972).

*Amos*, 483 U.S. at 332 n.9; *see also Curay-Carmer*, 450 F.3d at 140 (noting that the 1972 amendment also expanded the exemption for religious employers by adding § 2000e-2(e) to provide that it would not be an unlawful employment practice for a religious school to hire employees based on their religious beliefs). Thus, it is not necessary that the activities of the employer be "religious" activities for the exemption to apply. *See id.*; *see also id.* at 331 & 340 (holding that application of the § 2000e-1(a) exemption to "secular non-profit activities of religious organizations" does not violate the Establishment Clause of the First Amendment); *Lown v. Salvation Army, Inc.*, 393 F. Supp. 2d 223, 247 (S.D.N.Y. 2005) (as amended in 1972, the § 2000e-1(a) exemption applies "to any activities of religious organizations, regardless of whether those activities are religious or secular in nature"). On the other hand, the provision does not "confer upon religious organizations the right to make those same [employment] decisions on the basis of race, sex, or national origin." *Rayburn v. General Conference of Seventh Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986); *accord Petruska v. Gannon Univ.*, ___ F.3d ___, ___, 2006 WL 2548343, *4 (3d Cir. Sept. 6, 2006) (citing *Rayburn* for this

proposition); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000) ("[W]hile Title VII exempts religious organizations for 'discrimination based on religion,' it does not exempt them 'with respect to all discrimination.... [ ] Title VII still applies ⋯ to a religious organization charged with sex discrimination.'") (quoting *Boyd v. Harding Academy of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996), and citing *Rayburn*).

### 2. *Can Mercy assert the exemption?*

Saeemodarae asserts that Mercy simply is not a "religious organization" that is entitled to assert the "religious organization" exemption in § 2000e-1(a). In determining whether an institution or entity is entitled to assert the exemption, the court must "look at all the facts," and in making this inquiry, "[i]t is appropriate to consider and weigh the religious and secular characteristics of the institution." *Hall*, 215 F.3d at 624 (considering the applicability of both the "religious organization" exemption in § 2000e-1(a) and the "religious school" exemption in § 2000e-2(e)(2)).

In *Hall*, the court treated the "religious school" exemption in § 2000e-2(e)(2) as a more specific exemption than the "religious organization" exemption in § 2000e-1(a). *See id.* (quoting § 2000e-1(a), then noting "[a]nother, more specific exemption [in § 2000e-2(e)(2)] applies only to religious educational organizations."). Thus, if anything, *Hall* stated more specific factors, for purposes of the § 2000e-2(e)(2) exemption, than are required for application of the § 2000e-1(a) exemption. In *Hall*, the court identified pertinent factors for determining whether the exemptions should apply as including an examination of the "religious nature" of the purported "religious organization," as demonstrated by such things as whether it was supported and controlled by a religious corporation; whether and to what extent its purpose was making the interrelated religious/service mission of the pertinent religious denomination a reality; and whether the institution was founded by sectarian entities. *Id.* at 624-25. The court also looked at the "atmosphere" of the entity, including whether that "atmosphere" was "permeated with

religious overtones"; where and how it recruited its students or employees; whether prospective students were informed of the religious mission of the entity; whether incoming students were informed of the religious mission at orientation; whether materials and facilities were decorated with religious images; whether religious studies were required; whether regular religious ceremonies and practices were observed; and whether the entity hosted religious programs. *Id.* at 625. The court held that the fact that the institution trained its students in secular professions, in that case, health care, did not transform the institution into one that was secular. *Id.*

In an earlier case, *Killinger v. Samford University*, 113 F.3d 196 (11th Cir. 1997), the Eleventh Circuit Court of Appeals addressed the qualification of an ostensibly religious university to assert the "religious organization" exemption in § 2000e-1(a), rather than the more specific "religious school" exemption in § 2000e-2(e)(2). *See Killinger*, 113 F.3d at 198. In finding that the university was a "religious organization" within the meaning of § 2000e-1(a), the court rejected the plaintiff's contention that the university was not sufficiently "sectarian," because "rigid sectarianism" is not required to invoke the exemption, nor had prior decisions required that all employees (or students) of the institution belong to the sponsoring sect. *Id.* at 198-99 (noting that, in *EEOC v. Mississippi College*, 626 F.2d 477, 479 (5th Cir. 1980), 95% of the faculty and 88% of a Baptist college were Baptist). The court then noted numerous factors that were pertinent to its conclusion that the university qualified for the "religious organization" exemption: The college was founded as a "theological" institution by the Alabama Baptist State Convention, and while the Convention no longer had the authority to elect the school's trustees, all of the trustees were and, with only one exception, always had been Baptist; seven percent of the institution's annual budget came from the Convention, and that sum was the largest single source of funding; the university reported its financial status to the Convention and another Baptist institution; the school was a member of the Association of

Baptist Colleges and Schools; all faculty were required to subscribe to the 1963 Baptist Statement of Faith and Message, and both faculty contracts and the faculty handbook affirmed this commitment; the school's charter designated its chief purpose to be the promotion of the Christian religion; all students were required to attend chapel; and the IRS had granted the school religious exemptions. *Id.* at 199. The court never suggested, however, that any or all of these factors were *required* for an institution to assert the exemption. Moreover, in *Killinger*, the court rejected the plaintiff's contention that there is an "institutional policy" requirement that would require the institution to establish a causal relationship between a specific religious policy and the termination of the employee, because the university's policy included its general purpose, principles, and tendencies as a religious institution, and there was no requirement that a strict policy of religious discrimination in employment decisions was required to assert the exemption. *Id.* at 199-200; *see also Wirth v. College of the Ozarks*, 26 F. Supp. 2d 1185, 1188 (W.D. Mo. 1998) (finding that a college founded by the Presbyterian Church Synod was a "religious corporation" exempt from claims of religious discrimination, because the college was incorporated as a not-for-profit corporation, its charter mission was to provide a Christian education, the college was a member of the Coalition for Christian Colleges and Universities, a national organization of evangelical Christian institutions, and a member of the Association of Presbyterian Colleges and Universities; the fact that the college was non-denominational did not undermine its exempt status, because the exemption applied notwithstanding the particular beliefs that the religious corporation sought to foster).

Here, the court finds that there is no genuine issue of material fact that both the "nature" of Mercy and the "atmosphere" at Mercy are unequivocally "religious." *See Hall*, 215 F.3d at 624-25. Mercy's "nature" is undisputedly religious, because it was founded by sectarian entities, the Sisters of Mercy; it is supported and controlled by a Catholic institution, Trinity Health—Michigan, which is a Michigan non-profit corporation

that seeks to act in ways that promote the spiritual teachings and principles of the Roman Catholic Church; and its purpose is making the interrelated religious/service mission of the Catholic Church a reality, because it is undisputed that Mercy's mission is to continue the healing ministry of the Catholic Church and to promote the well being of the people it serves by living the values of compassion, respect, concern for the poor, excellence, and stewardship. *See id.* (identifying similar factors); *Killinger*, 113 F.3d at 199 (also looking at whether the purported "religious organization" was founded, controlled, and funded by sectarian institutions). Mercy's "atmosphere" is also undisputedly "religious," because as in *Hall*, the "atmosphere" is "permeated with religious overtones," as demonstrated by religious decoration and iconography throughout the Hospital; handbooks and orientation materials for employees that inform them of Mercy's religious mission and religious foundation; the F.I.S.H. initiative, which reaffirmed the religious values of the institution; the regular practice of religious ceremonies, such as prayers and devotions broadcast on the hospital speaker system; and the well-developed pastoral care program with a staff of on-site chaplains. *See id.* (identifying similar factors contributing to the religious "atmosphere" of the institution); *Killinger*, 113 F.3d at 199 (noting that faculty contacts and handbooks and student orientation materials informed faculty and students of the religious mission and purpose of the institution, that religious education was required, and that religious ceremonies were observed).

Saeemodarae contends, however, that members of Mercy's governing board are not required to be Catholic and, in fact, only ten of the fifteen members of the board are Catholic, that Mercy recruits its employees from the population at large, using many sources, none of which could be characterized as "Catholic," and that Mercy does not *require* its employees to take religious instruction or require a particular religious affiliation for any employee other than the Director of Mission and Ethics, who is also the Director of the Pastoral Care Department. First, Mercy disputes Saeemodarae's contention

that none of the sources from which it recruits its employees could be characterized as "Catholic." Second, leaving aside whether Mercy disputes Saeemodarae's contentions, nothing Saeemodarae has cited is more than an isolated factor in what is an otherwise overwhelmingly religious context. Third, as to the "mixed membership" of the board and the employee pool, and the fact that only one position is expressly required to be occupied by a Catholic, "strict" or "rigid" sectarianism simply is not required. *See Killinger*, 113 F.3d at 198-99. Moreover, Mercy clearly articulates to its employees and actively pursues a policy that includes its general purpose, principles, and tendencies as a religious institution; there is no requirement that Mercy employ a strict policy of religious discrimination in employment decisions to assert the exemption. *Killinger*, 113 F.3d at 199-200. Nor does Saeemodarae's contention that Mercy's purpose to provide health care is "secular" change the outcome, because it is not necessary that the activities of the organization be "religious" activities for either the organization or the activities to be exempt. *See Amos*, 483 U.S. at 332 n.9; *see also id.* at 331 & 340 (applying the § 2000e-1(a) exemption to "secular non-profit activities of religious organizations" does not violate the Establishment Clause of the First Amendment); *Hall*, 215 F.3d at 625 (the fact that the institution trained its students in a secular profession, health care, did not transform the institution into one that was "secular"); *Lown*, 393 F. Supp. 2d at 247 (as amended in 1972, the § 2000e-1(a) exemption applies "to any activities of religious organizations, regardless of whether those activities are religious or secular in nature").

Saeemodarae next asserts that Mercy waived the exemption in two ways: (1) by holding itself out as an equal opportunity employer; and (2) by failing to assert the exemption in proceedings before the ICRC. The first argument failed in *Hall*, because the court found that "the statutory exemptions from religious discrimination claims under Title VII cannot be waived by either party." *Hall*, 215 F.3d at 625 (citing *Little*, 929 F.2d at

951; *Siegel v. Truett-McConnell College, Inc.*, 13 F. Supp. 2d 1335, 1345 (N.D. Ga. 1994), *aff'd*, 73 F.3d 1108 (11th Cir. 1995) (table op.)).  As the court explained in *Hall*,

> The exemptions reflect a decision by Congress that religious organizations have a constitutional right to be free from government intervention.  *Id.*  "Once Congress stated that '[t]his title shall not apply' to religiously-motivated employment decisions by religious organizations," neither party could expand the statute's scope.  *Siegel*, 13 F. Supp. 2d at 1345 (quoting *Little*, 929 F.2d at 951).  Accordingly, the court in *Ward v. Hengle*, 124 Ohio App.3d 396, 400, 706 N.E.2d 392 (1997), held that the trial court need not even determine whether a church waived its Title VII exemption from religious discrimination claims based on a statement in its employment handbook that it would not discriminate against its personnel on the basis of religion.  *See also Siegel*, 13 F. Supp. 2d at 1344 (government funds are most likely available to all institutions of higher learning whether or not they have a religious affiliation).

*Hall*, 215 F.3d at 625.  The inability of either party to waive the "religious organization" exemption applies here to both Saeemodarae's assertion of waiver based on Mercy's equal employment opportunity policy and her assertion of waiver based on Mercy's failure to raise the exemption before the ICRC.

Moreover, while Mercy did have an Equal Employment Opportunity/Workforce Diversity Policy, that policy contained no undertaking not to discriminate against its personnel on the basis of religion.  *Compare Siegel*, 13 F. Supp. 2d at 1344 (the religious organization's employment handbook contained such an undertaking).  Rather, as Mercy points out, its policy only states that Mercy will not discriminate "for any reason prohibited by law," and religious discrimination in employment by a religious organization is not "prohibited by law."  Thus, Mercy's equal employment opportunity policy does not waive an exemption for religious discrimination claims.

The court finds that, as a matter of law, Mercy is a "religious organization" entitled to assert the exemption to Title VII religious discrimination claims set forth in § 2000e-1(a).

### 3. *Does the exemption apply to Saeemodarae's claims?*

Because the court finds that Mercy is, as a matter of law, an entity entitled to assert the "religious organization" exemption in § 2000e-1(a), the next question is, does the exemption bar Saeemodarae's claims? Mercy asserts that the exemption bars Saeemodarae's Title VII claims for religious discrimination and retaliation. Saeemodarae contends that, even if Mercy is exempt from her Title VII religious discrimination claim, Mercy is not exempt from her Title VII retaliation claim. The court will consider the applicability of Mercy's exemption to both of Saeemodarae's Title VII claims, in turn.

#### a. *The religious discrimination claim*

As the Third Circuit Court of Appeals has explained, "The statute exempts religious entities . . . from [Title VII's] nondiscrimination mandate to the extent that an employment decision is based on an individual's religious preferences." *Petruska*, ___ F.3d at ___, 2006 WL 2548343 at *4. More specifically, "[t]he decision to employ individuals 'of a particular religion' under § 2000e-1(a) and § 2000e-2(e)(2) has been interpreted to include the decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer." *Hall*, 215 F.3d at 624 (citing as examples *Little v. Wuerl*, 929 F.2d 944, 951 (3rd Cir. 1991), in which the court concluded that the Title VII exemption included the decision of a parochial school to terminate a tenured Protestant teacher who had failed to validate her second marriage by first seeking an annulment of her previous marriage through the proper canonical procedures of the Catholic church, and *Killinger v. Samford Univ.*, 113 F.3d 196, 198 (11th Cir. 1997), in which the court concluded that the Title VII exemption included the decision of a Baptist university to remove a Baptist

faculty member from his teaching position because his religious beliefs differed from those of the dean).

In *Killinger*, the court concluded that the § 2000e-1(a) exemption "allows religious institutions to employ only persons whose beliefs are consistent with the employer's when the work is connected with carrying out the institution's activities." *Killinger*, 113 F.3d at 200. However, as mentioned above, it is not necessary that the activities of the employer be "religious" activities. *See Amos*, 483 U.S. at 332 n.9 (noting that, "[p]rior to [1972], § 702 exempted only the religious activities of religious employers from the statutory proscription against religious discrimination in employment," but "[t]he 1972 amendment extend[ed] the exemption to all activities of religious organizations"); *see also id.* at 331 & 340 (applying the § 2000e-1(a) exemption to "secular non-profit activities of religious organizations" does not violate the Establishment Clause of the First Amendment); *Lown*, 393 F. Supp. 2d at 247 (as amended in 1972, the § 2000e-1(a) exemption applies "to any activities of religious organizations, regardless of whether those activities are religious or secular in nature"). Nor is it necessary that the employee be engaged in "religious" duties. *Killinger*, 113 F.3d at 199-200 (the institution is not required to demonstrate any "causal relationship" between a specific religious policy and the employee's termination from her "secular" position to invoke the exemption); *Siegel*, 13 F. Supp. 2d at 1339 (relying on *Amos* to hold that "'whether an employee's duties within the non-profit organization are secular or not, the religious exemption can be used as a basis for termination'") (quoting *Dodge v. Salvation Army*, 1989 WL 53857, *2 (S.D. Miss. 1989)).

The conduct by Mercy that Saeemodarae contends constituted religious discrimination—discriminating against, and ultimately firing, Saeemodarae because of her Wiccan religious beliefs and activities motivated by those religious beliefs, including reading Wiccan literature while at work—appears to fall squarely within the scope of the

exemption. Such conduct was precisely basing employment decisions on Saeemodarae's individual religious preferences, *see Petruska*, ___ F.3d at ___, 2006 WL 2548343 at *4, and terminating her employment because her conduct or religious beliefs are inconsistent with those of her employer. *Hall*, 215 F.3d at 624.

Indeed, Saeemodarae does not contend otherwise, at least as to her religious discrimination claims. Saeemodarae does contend, however, that her position and job duties were "secular." Even assuming that she is correct, the fact that her duties were "secular" does not require a different result. Just as there is no requirement that the employer be engaged in "religious" activities to invoke the exemption, *see Amos*, 483 U.S. at 332 n.9 (the 1992 amendments extended the "religious organization" exemption to all activities of "religious organizations," not just religious activities), there is no requirement that the employee be engaged in "religious" duties for the exemption to apply to the employee's claims. *See Siegel*, 13 F. Supp. 2d at 1339 (relying on *Amos* to hold that an employee's "secular" duties do not make the "religious organization" exemption inapplicable). Similarly, Mercy is not required to demonstrate any "causal relationship" between a specific religious policy and Saeemodarae's termination from her "secular" position as a telemetry technician to invoke the exemption. *Killinger*, 113 F.3d at 199-200 (the institution is not required to demonstrate any "causal relationship" between a specific religious policy and the employee's termination from her "secular" position to invoke the exemption).

In short, as a matter of law, Mercy is exempt pursuant to § 2000e-1(a) to Saeemodarae's Title VII religious discrimination claim. Mercy is, therefore, entitled to summary judgment on that claim.

### b.    *The retaliation claim*

Saeemodarae maintains that there is a "fighting issue" as to whether Mercy's "religious organization" exemption extends to her Title VII retaliation claim, even if the

exemption extends to her Title VII religious discrimination claim. In *Lown v. Salvation Army, Inc.*, 393 F. Supp. 2d 223 (S.D.N.Y. 2005), the court disposed of the Title VII retaliation claim of employees of a "religious organization" succinctly as follows:

> Plaintiffs' Title VII retaliation claim must be dismissed because the broad language of Section 702 provides that "[t]his subchapter shall not apply ⋯ to a religious ⋯ institution ⋯ with respect to the employment of individuals of a particular religion⋯" 42 U.S.C. § 2000e-1(a). Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), is contained in the same subchapter as Section 702. Accordingly, it does not apply here. *See Hall*, 215 F.3d at 625 (Section 702 "reflect[s] a decision by Congress that religious organizations have a constitutional right to be free from governmental intervention.").

*Lown*, 393 F. Supp. 2d at 254. This court agrees that, as a matter of "plain language," the exemption in § 2000e-1(a) for "religious organizations" from "[t]his subchapter," necessarily includes an exemption from the anti-retaliation provision in 42 U.S.C. § 2000e-3(a), which is in the same subchapter. *See, e.g., Connecticutt Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("plain language" is the "one, cardinal canon before all others," and "courts must presume that a legislature says in a statute what it means and means in a statute what it says there") (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241-42 (1989); *United States v. Goldenberg*, 168 U.S. 95, 102-03 (1897); *Oneale v. Thornton*, 10 U.S. (6 Cranch) 53, 3 L.Ed. 150 (1810)). Moreover, as Mercy contends, it makes little sense to permit retaliation claims, because to do so would erode the intended effect of the exemptions, which is to recognize "the constitutionally-protected interest of religious organizations in making religiously-motivated employment decisions," *Hall*, 215 F.3d at 623, at least where the underlying claim that the employee was allegedly retaliated against for asserting is a religious discrimination claim.

Therefore, the court concludes that, as a matter of law, Mercy's § 2000e-1(a) "religious organization" exemption extends to Saeemodarae's retaliation claim, based on retaliation for asserting religious discrimination, as well as her underlying religious discrimination claim.[8]

## C. The ICRA's "Bona Fide Religious Institution" Exemption

Saeemodarae has also asserted religious discrimination and retaliation claims pursuant to the Iowa Civil Rights Act (ICRA), IOWA CODE CH. 216. Mercy has also asserted that it entitled to summary judgment on those claims, because Mercy contends that, as a matter of law, it is entitled to assert an exemption for "bona fide religious institutions" to claims of religious discrimination under the ICRA similar to the Title VII exemption.

### 1. The applicable exemption

The ICRA defines various "unfair or discriminatory" employment practices, including discrimination in employment "because of the age, race, creed, color, sex, national origin, religion, or disability" of the employee or applicant. IOWA CODE § 216.6(1)(a). However, like Title VII, § 216.6 of the ICRA also provides exemptions for religious entities from claims of religious discrimination, as follows:

> 6.      This section shall not apply to:
> * * *
> d.      Any bona fide religious institution or its educational facility, association, corporation, or society with respect to any qualifications for employment based on religion when such qualifications are related to a bona fide religious purpose. A religious qualification

---

[8]Because the court holds that Mercy is exempt from Saeemodarae's Title VII retaliation claim, the court need not consider Mercy's alternative arguments that Saeemodarae's Title VII retaliation claim is fatally flawed.

> for instructional personnel or an administrative officer,
> serving in a supervisory capacity of a bona fide
> religious educational facility or religious institution,
> shall be presumed to be a bona fide occupational
> qualification.

IOWA CODE § 216.6(6)(d). The parties assert that no Iowa court has interpreted this provision, and the court has found no Iowa or other court that has done so. On what appears to be an issue of first impression, Saeemodarae argues that this exemption employs different language than the Title VII exemption and should be interpreted differently. While Mercy concedes that there are differences in the language of the state and federal exemptions, Mercy contends that the language is not so materially different that the state exemption should be interpreted differently.

### 2. *Should the court exercise supplemental jurisdiction to interpret the exemption?*

Although neither party raised the possibility in the briefing or argument of Mercy's motion for summary judgment, the court finds that it should decline to exercise supplemental jurisdiction over Saeemodarae's state-law religious discrimination and retaliation claims, where the court has determined that Mercy is entitled to summary judgment on the federal claims over which this court has original jurisdiction. As the Eighth Circuit Court of Appeals recently explained,

> Under 28 U.S.C. § 1367(c)(3), a court may "decline to exercise supplemental jurisdiction over a claim ⋯ [if] the district court has dismissed all claims over which it has original jurisdiction." Congress unambiguously gave district courts discretion in 28 U.S.C. § 1367(c) to dismiss supplemental state law claims when all federal claims have been dismissed[.]

*Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006). Although determining whether to dismiss state-law claims pursuant to § 1367(c)(3) is a matter in the district court's discretion, "'[i]n the usual case in which all federal-law claims are eliminated before trial,

35

the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Barstad v. Murray County*, 420 F.3d 880, 888 (8th Cir. 2005) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)).

Here, the court finds that comity strongly suggests that the court should decline to consider whether Mercy is entitled to assert the ICRA "bona fide religious institution" exemption or whether that exemption, if Mercy is entitled to raise it, exempts Mercy from Saeemodarae's religious discrimination and retaliation claims. First, the language of the ICRA exemption is different, perhaps in material ways, from the Title VII exemption. The Iowa Supreme Court has repeatedly noted that, "[b]ecause the ICRA is in part modeled after Title VII, we have traditionally looked to federal law for guidance in interpreting it." *McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005) (citing *Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003)). However, where, as here, the provisions of the state and federal statutes have potentially materially different language, courts should be reluctant to assume that the exemption provision of the ICRA was "modeled after" the comparable exemption provision of Title VII, and the courts should, therefore, be decidedly reluctant to look to the federal law interpreting the federal provision for guidance in interpreting the state provision. Second, except where other factors weigh strongly in favor of exercising supplemental jurisdiction, the court believes that interpretation of a state statute as a matter of first impression should be left to the state courts. Indeed, 28 U.S.C. § 1367(c)(1) provides, independently, that the district courts may decline to exercise supplemental jurisdiction over a claim under § 1367(a), if "the claim raises novel or complex issues of State law." *See Fielder v. Credit Acceptance Corp.*, 188 F.3d 1031, 1038 (8th Cir. 1999) ("[N]ovel, complex, and important issues of state law on which the [state] appellate courts have given us little or no prior guidance . . . are precisely the types

of issues as to which federal courts should hesitate to exercise § 1367 supplemental jurisdiction.").

This court, likewise, finds that fairness dictates that it should decline to exercise supplemental jurisdiction over the remaining state-law claims. *See Barstad*, 420 F.3d at 888 (considering "fairness" as a factor that will usually point to declining to exercise supplemental jurisdiction over remaining state-law claims). Where the viability of Saeemodarae's state-law claims and Mercy's exemption to those claims depends upon the interpretation of an Iowa statute, it is clearly more fair to the parties for the Iowa appellate courts, which have the ultimate say on interpretation of Iowa law, to have the first say. Nor is it unfair to the parties to relinquish Saeemodarae's remaining claims to state court, because this litigation was filed less than a year ago and has not advanced beyond limited discovery on the factual basis for Mercy's assertion of exemptions. What limited discovery has been conducted in this court will not be "lost," if the exemption issue arises again in state court. Moreover, Saeemodarae's action will not be "lost," because Iowa's "savings" or "failure of action" statute, IOWA CODE § 614.10, will preserve her action. *See* IOWA CODE § 614.10 ("If, after the commencement of an action, the plaintiff, for any cause except negligence in its prosecution, fails therein, and a new one is brought within six months thereafter, the second shall, for the purposes herein contemplated, be held a continuation of the first.").

Finally, the court finds that judicial economy and convenience of the parties warrant declining to exercise supplemental jurisdiction over the remaining state-law claims. *See Barstad*, 420 F.3d at 888 (suggesting that both of these factors will usually point to declining to exercise supplemental jurisdiction over remaining state-law claims). Both parties are in Iowa and have access to Iowa courts, and it is more economical for the courts charged with interpreting Iowa law to pass on issues of first impression under Iowa law in the first instance.

Therefore, the court will decline to exercise supplemental jurisdiction over Saeemodarae's remaining ICRA claims of religious discrimination and retaliation or to entertain the issue of first impression concerning whether Mercy is exempt from those claims under the ICRA's "bona fide religious institution" exemption.

### III.  CONCLUSION

Upon the foregoing, there is no genuine issue of material fact that Mercy is a "religious organization" entitled to assert the "religious organization" exemption to Title VII claims of religious discrimination in employment under 42 U.S.C. § 2000e-1(a). While this court is sensitive to the issues of discrimination against protected persons, including adherents of a "minority" religion, the court nevertheless finds that the broad exemption for "religious organizations" from religious discrimination claims under Title VII plainly applies to Saeemodarae's Title VII claims of religious discrimination and retaliation.  Consequently, Mercy is entitled to summary judgment on Saeemodarae's Title VII claims.  On the other hand, pursuant to 28 U.S.C. § 1367(c)(1) and (3), the court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Saeemodarae's remaining state-law claims of religious discrimination and retaliation in violation of the ICRA, where the interpretation of the ICRA exemption for "bona fide religious institutions" is a matter of first impression.

One final point.  This opinion addresses only the question of whether Mercy, in allegedly discriminating against an employee on the basis of her Wiccan religion, violated Tittle VII.  Just because Congress has broadly enabled religious organizations to discriminate against employees on the basis of their religion does not mean that they must or should do so.  Thus, this opinion does not address whether Mercy's actions were fair, just, or moral.  Some will wonder why a Catholic religious organization like Mercy did not have room in its employee ecumenical tent for Ms. Saeemordarae.  Was it fear of a

perceived odd or strange religion like the Wicca religion? Was it religious intolerance or bigotry? Was the discharge "a Christian thing to do"? Were Mercy's actions consistent with its Catholic theology and teachings? These questions, interesting and probing as they may be, are clearly far beyond the reach of this federal court.

THEREFORE,

1.     Mercy's July 12, 2006, Motion For Summary Judgment (docket no. 12) is **granted**, to the extent that the court finds that Mercy is exempt pursuant to 42 U.S.C. § 2000e-1(a) to Saemodare's Title VII religious discrimination and retaliation claims in her Complaint (docket no. 2), and those claims are **hereby dismissed**.

2.     Pursuant to 28 U.S.C. § 1367(c), the court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Saeemodarae's remaining state-law claims of religious discrimination and retaliation in violation of the ICRA, and those claims are **hereby dismissed**.

**Judgment of dismissal shall enter accordingly.**

**IT IS SO ORDERED.**

**DATED** this 6th day of October, 2006.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA